UNITED STATES DISTRICT COURT  SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Petrofac, Inc., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | Civil Action H-10-2638 |
| | § | |
| DynMcDermott Petroleum | § | |
| Operations Company, | § | |
| | § | |
| Defendant. | § | |

## Opinion on Arbitrability

1.  *Background.*

     In 2001, DynMcDermott Petroleum Operations Company hired Petrofac, Inc., to design, engineer, and construct a plant to extract the gas dissolved in the oil stored in the Strategic Petroleum Reserve. Petrofac began work in early 2002. DynMcDermott's changes and errors caused Petrofac to incur extra work and other additional costs. Among other problems, DynMcDermott interfered with the job assigned to Petrofac in the subcontract.

     In 2004, in a document called a request for equitable adjustment, Petrofac painstakingly detailed and quantified the extra costs caused by DynMcDermott's changes and errors. The construction industry also calls work resulting from extra-contractual requirements constructive changes.

     For two years, the parties tried to resolve this request for additional payment among their many, many other issues. By 2006, they had settled some of them, and the ones that remained – including the request for equitable adjustment – they agreed to arbitrate.

     Well before the arbitration, Petrofac hired Frank Adams, an engineering consultant, to calculate its damages. Using the identical events described in the request for equitable adjustment but a different approach to his calculation, Adams estimated Petrofac's additional costs to be about $4 million – $2.9 million less than the calculation in the initial request for equitable adjustment.

The arbitration panel awarded Petrofac nearly $5.5 million for all claims. Unhappy, DynMcDermott has asked this court to vacate the award. Among other arguments, DynMcDermott says that the arbitration panel exceeded its authority by hearing Petrofac's presentation of damages for the extra work through the Adams report, rather than only the 6,000-page request for equitable adjustment. DynMcDermott agrees that the factual premise for both quantifications are the same.

2.    *Three Years, Three Agreements.*

Three agreements track the evolution of their negotiations about DynMcDermott's impeding the job. In mid-project in 2003, Petrofac realized the interference was becoming a problem. In response, they agreed in a letter in July of 2003 to arbitrate "any Request for Equitable Adjustment or claim submitted against the . . . subcontract."

By December of 2005, they had resolved some of their issues and memorialized this progress in a settlement agreement. This settlement, however, reserved the few issues they had not resolved for arbitration, including the "Request for Equitable Adjustment submitted by Petrofac, Inc., as may be amended or supplemented."

Having still reached no compromise in July of 2006, they agreed to arbitrate the reserved claims including Petrofac's request for equitable adjustment "and all claims and disputes between them arising out of or relating to the Subcontract."

3.    *Scope.*

DynMcDermott maintains that the Adams report and the request for equitable adjustment are fundamentally different claims. They are not. Regardless of the label used, the matter is categorically the same: the causes and quantification of Petrofac's additional costs caused by DynMcDermott. Whether called a lightning bug or a firefly, it is the same insect.

The text of the final release and the arbitration agreement show that they intended to arbitrate the issues contained in the request – not a particular method of calculation or words to describe them. Beneath the labels and abstractions lies an obdurate reality.

The release says the request may be "amended," and the arbitration agreement says that they intend to arbitrate the issues "stemming from the subcontract." If the parties intended only to reserve the document itself for arbitration, then no amendments would have been permitted, and the arbitration agreement would have no need to describe its purpose as a forum

for "issues stemming form the subcontract." The words themselves show that DynMcDermott and Petrofact intended to arbitrate the problem however mathed and however dressed.

Calling these costs a request for equitable adjustment is simply a modifier, a common term in the construction industry.  If the report were called a inter-contractor protocol, the adjusted drawings, modified specifications, and other issues are identical in both the Adams report and the request for equitable adjustment.  DynMcDermott may not avoid arbitrating these claims because they may be called by another name.  The transactions addressed in the request for equitable adjustment as presented in the Adams report were within the panel's authority.

3.    *Arbitrability.*

DynMcDermott says that when it objected to the panel's consideration of the Adams report, the panel should have never considered the arbitrability of the report. DynMcDermott thinks that whether the report was within the scope of the panel's empowerment is for a court – not the panel – to decide.

DynMcDermott misses the point.  If an issue was not within the panel's authority it should move to modify the award because the matter was not submitted to the panel.  9 U.S.C. 11 (b).

Nevertheless, even if the panel had not been empowered to decide whether a issue had been submitted to it, DynMcDermott waived its objections to the Adams report. Petrofact gave DynMcDermott the Adams report nine months before the hearing.  It knew the differences, replied to the report, and acknowledged those differences at the March session of the arbitration.  Not until the resumption of the arbitration in October of 2009 – sixteen months it got the Adams report and six months into the arbitration – did DynMcDermott object to its arbitrability.  By waiting so long to object to the report DynMcDermott waived its right – if any – to question the arbitrability of issues it discusses.

4.    *Fraud and Misconduct.*

DynMcDermott has also asked this court to vacate the award for fraud in its procurement and misconduct by the panel.  Both of these accusations are directed at Petrofac's calculation of workers' hours – approximately $200,000 of the award.

Fraud could not have occurred because no information was hidden or misrepresented to DynMcDermott. It raised the hours issue with the panel, and the panel disagreed. Moreover, if DynMcDermott had honestly believed that Petrofac had reclassified hours, it had all information at its disposal to ascertain the truth. Adverse rulings are not evidence of venality.

No misconduct occurred either. The panel had authority to deny DynMcDermott the extra discovery it requested after the discovery period had closed. For this ground to exist, the movant must have shown a process that cannot be said to be the product of rational analysis and disinterested deliberation and an award that bears no rational relation to the dispute in fact between the parties.

5.     *Conclusion.*

The arbitration award will subsist. By noon on February 18, 2011, Petrofac will submit a draft judgment.

Signed on February 15, 2011, at Houston, Texas.

Lynn N. Hughes
United States District Judge